FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB 10 2016
2-10-16
Judge Thomas M. Durkin
United States District Cou

UNITED STATES OF AMERICA

v.

GWEN HILSABECK

No. 14 CR 33-2

Judge Thomas M. Durkin

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant GWEN HILSABECK, and her attorney, JOHN COLLINS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with health care fraud, in violation of Title 18, United States Code, Section 1347 (Counts 1 through 16), making a false statement in a health care matter (Count 17), and conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371 (Count 18).

3.     Defendant has read the charges against her contained in the indictment, and those charges have been fully explained to her by her attorney.

4.     Defendant fully understands the nature and elements of the crimes with which she has been charged.

## Charge to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count Eighteen, which charges defendant with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section and 371.

## Factual Basis

6. Defendant will plead guilty because she is in fact guilty of the charge contained in Count Eighteen of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish her guilt beyond a reasonable doubt:

Beginning no later than on or about August 3, 2009 and continuing until at least on or about September 8, 2009, in the Northern District of Illinois, Eastern Division, and elsewhere, GWEN HILSABECK did conspire with Seth Gillman, Carmen Velez, Passages Hospice, LLC and others to commit an offense against the United States, namely, with intent to deceive and defraud the United States, defendants endeavored to influence, obstruct, and impede a Federal auditor, TrustSolutions, in the performance of official duties relating to Medicare, in violation of Title 18, United States Code, Section 1516.

Defendant worked as a co-administrator at Passages Hospice, which was a company that provided hospice services for Medicare and Medicaid patients in Illinois. In or about August 2009, HILSABECK learned that TrustSolutions, which performed audits on behalf of Medicare, had requested patient files from Passages

in connection with an audit. Thereafter, HILSABECK came to an agreement with Seth Gillman, who was a co-owner and co-administrator, and Julie Parker, who was Passages' compliance officer at the time, to alter and direct the alteration of the patient files requested by TrustSolutions, and did direct the alteration of those files, in order to make it appear that the files supported claims for general inpatient care previously submitted by Passages to Medicare. HILSABECK knew that some of the files did not contain signed orders from physicians regarding the GIP care billed by Passages and did not contain nursing notes consistent with patients actually receiving GIP care as had been billed. HILSABECK instructed the nursing directors and the CNA directors to assist in altering files. HILSABECK knew that some of the nursing directors were upset about being asked to alter files, and that at least one of them made comments about "looking good in prison orange." HILSABECK understood this comment to refer to the fact that those participating in altering the files knew that it was wrong to do so and that they were trying to deceive the auditor.

Through this process, HILSABECK and Gillman received updates on problems in the files that showed that Passages had improperly billed for GIP care. For example, HILSABECK and Gillman both received notes from Julie Parker in August 2009 stating that the files were missing physician orders and that many of the visits had been routine visits and documented as such when they had been billed as GIP visits. They also were informed via these notes that Passages had billed GIP care for a patient who was in assisted living, rather than at a skilled

3

nursing facility that provided 24-hour nursing services, and thus the patients could not have not qualified for GIP.

HILSABECK and Gillman had multiple exchanges about how to direct the alteration of patient files. For example, on August 11, 2009, HILSABECK reported in an email to Gillman, "Things r progressing with the Medicare audit. Angela and Carmen r now in Bloomington and all is well. Everyone promised me that they would all play well tomorrow and work as a team. I have set up folders for every patients and attached a checkoff list for each patient. They all r spending the night again and will not leave tomorrow until all info is corrected and printed out." HILSABECK knew that Armenta and Velez were leading the other directors in altering the patient files.

On August 16, 2009, HILSABECK, Gillman, and Parker had an e-mail exchange about asking TrustSolutions for more time. In one email, HILSABECK raised a question about how Passages could justify asking for more time without revealing that employees were altering files. Gillman replied by saying that he would ask for more time. HILSABECK believed that Gillman provided a false excuse to TrustSolutions because she knew that Gillman could not reveal that the actual reason for the delay was the need for more time to continue altering the requested patient files.

On August 18, 2009, HILSABECK reported in an email to Gillman that the patient files were missing 12 chaplain assessments. HILSABECK reported to Gillman that an employee "will 'find' them and get them to me tomorrow."

4

HILSABECK knew that such assessments did not exist and that she was actually reporting to Gillman that the employee would create false assessments. Gillman replied to the email by complimenting the employee.

On September 2, 2009, HILSABECK reported in an email to Gillman that an outside auditor had completed a review of the patient files that had been altered by that point and had provided comments on deficiencies in the files, including identifying patients who had been billed for GIP care even though the patients did not qualify. HILSABECK reported to Gillman that nursing directors and CNA directors were going to make additional alterations to the patient files based on the outside auditor's comments.

HILSABECK knew that, when the alterations were completed, Gillman signed letters attesting to the accuracy of the patient files and that the services had been properly billed. HILSABECK knew that this was not true because the files had been altered and because some of the services had not been properly billed, such as for the patient who had been in assisted living.

HILSABECK also knew that Parker and others altered additional patient files that TrustSolutions requested in late 2009. On November 23, 2009, HILSABECK had an email exchange with Gillman in which they discussed getting the billing corresponding to the requested files so that they would "know what charting should reflect." HILSABECK understood this to mean that Passages personnel would falsify the charts to match the billing information.

5

HILSABECK acknowledges that Medicare was a program that received in excess of $100,000, directly or indirectly, from the United States in any one-year period and that TrustSolutions was a Federal auditor employed on a contractual basis to perform an audit on behalf of the United States related to the Medicare program.

7.     Defendant, for purposes of computing her sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense:

Beginning no later than August 2009 and continuing through January 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant GWEN HILSABECK did participate in a scheme to defraud a health care benefit program, as defined by Title 18, United States Code, Section 24(b), namely Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money under the custody and control of that program in connection with the delivery of and payment for health care benefits and services, in violation of Title 18, United States Code, Section 1347.

More specifically, HILSABECK and others participated in a scheme to cause Passages to submit false claims to Medicare and Medicaid for medically unnecessary hospice care, namely, hospice care for patients who were not terminally ill and hospice care that did not qualify for GIP care. HILSABECK submitted and caused to be submitted claims to Palmetto, which was a Medicare contractor, and the Illinois Department of Healthcare and Family Services for GIP care when such services were not medically necessary and were not provided.

6

HILSABECK and co-defendant Seth Gillman designed and implemented a system at Passages in which bonuses were paid to nursing directors and certified-nursing directors based on the number of patients that were placed on GIP care each day in order to cause those nursing directors and certified-nursing directors to place patients on GIP care even though those patients did not need such care. HILSABECK knew that theses bonuses were not compensation for the additional nursing services that nursing directors and CNA directors provided a patient who was placed on GIP care, because she knew that the nursing directors and the CNA directors did not provide any additional nursing services to such patients. HILSABECK knew that the bonus was designed to be an incentive to nursing directors and CNA directors to put patients on GIP care when in reality the patients did not need the extra nursing services that Passages employees provided when a patient was placed on GIP care. HILSABECK also knew that these bonuses were concealed from the nurses who actually performed additional nursing services to patients who were placed on GIP because those nurses would have objected to this practice.

In particular, by late 2008, HILSABECK knew that Passages was improperly billing for GIP care for patients who resided in nursing homes that did not have skilled nurses working 24 hours a day, since GIP care only can be billed when a patient is in a facility that provides 24-hour skilled-nursing care. HILSABECK raised a concern about this to co-defendant Seth Gillman. Gillman said that Passages could address this by entering into contracts with nursing homes

7

regarding GIP care, so that Passages could try to claim that it had believed that the nursing homes were providing 24-hour nursing services when he and HILSABECK knew they were not.

On May 25, 2009, Gillman wrote an email to HILSABECK asking who had informed co-defendant Carmen Velez about the GIP bonus that Velez began to receive once she became the nursing director for the region covering Chicago and its suburbs. HILSABECK wrote in her reply, "Come on, u know that if it wasn't for the bonus u wouldn't have any of these people on – so it is not like u r out anything – besides, half these people shouldn't be on most of the time anyways." In writing her email, HILSABECK acknowledged that many of the patients who were placed on GIP care should not have been, in part because they were not at skilled-nursing facilities that provided 24-hour nursing services.

HILSABECK further knew that Passages nurses were improperly placing patients on GIP care because they were doing so without obtaining physicians' approval beforehand. HILSABECK also discussed this practice with Gillman. For example, on August 7, 2009, HILSABECK sent an email to Gillman about a medical director who wanted to change this practice after attending a conference. HILSABECK wrote to Gillman that the physician "wants to approve all GIP before they put them on and he does not agree with some of the reasons." HILSABECK wrote that "I believe from the conference he attended, I am sure they put fear into part of the presentation." HILSABECK and Gillman allowed the medical director to change his practice in the region he covered, but HILSABECK knew that nurses

8

in other regions continued to put patients on GIP care without physicians' approval beforehand.

In addition, HILSABECK understood that co-defendant Angela Armenta in particular reviewed patient files to identify patients for GIP care, even though HILSABECK knew that Armenta was not a nurse and did not see the patients herself, and thus should not have been involved in identifying patients for GIP services. HILSABECK at times asked Armenta to find patients for GIP services, knowing that Armenta was not qualified to do so. For example, on or about September 23, 2009, Hilsabeck told Armenta to make sure that Passages had approximately 10 patients at one facility on GIP a day, and reported this to Gillman in an email. On May 13, 2010, HILSABECK sent an email to Armenta complaining about the number of patients on GIP, writing, "get me some more GIP."

HILSABECK also knew that Armenta instructed multiple nursing directors about GIP, even though Armenta was not a nurse and thus should not have been providing such instruction. For example, in the May 13, 2010 email, HILSABECK wrote that the nursing director who worked with Armenta at the time "needs a talking to about 'Quality of Care' and not overlooking any GIP qualifiers." HILSABECK acknowledges that she wanted Armenta to train the nursing director to put more people on GIP, even though HILSABECK and Armenta knew that many of the patients whom Passages placed on GIP should not have been billed to Medicare at the GIP level.

HILSABECK also knew that Gillman himself made decisions to put patients on GIP care even when he had no knowledge about the condition of the patient and even though he was not a physician or nurse. For example, HILSABECK received a June 2, 2009 email from Gillman discussing a situation where a nursing home wanted Passages to cover the room-and-board rate for a patient, Patient IK. In his email, Gillman wrote that Passages would cover the room-and-board rate and wrote that someone should "look up" "whether the woman is inpatient" and "see to it that she [the patient] is out on" GIP if the patient was not already on. Gillman also wrote, "Let's GIP her." HILSABECK understood that, in this email, Gillman was directing others to put Patient IK on GIP care without regard to whether Patient IK actually needed GIP and without seeking a physician's approval beforehand.

HILSABECK also knew that Gillman made decisions to admit patients to hospice service or to keep patients on hospice even when physicians had not approved such admissions. For example, on October 2, 2009, HILSABECK reported to Gillman by email that a medical director had not approved the admission of a patient. Gillman replied, "So fuck him and run it by [another medical director]." HILSABECK understood Gillman's email to be an instruction to disregard the medical director's decision and to find some other medical director who would approve the admission.

After receiving two reports of the inappropriate use of GIP in August 2010, HILSABECK stopped efforts to correct Passages' practices in September and October 2010. In particular, on August 16, 2010, HILSABECK and Gillman

10

received by email a report that was prepared by Individual LW, who was a Passages nurse who had legal training and who worked with Passages' compliance officer. In the report, Individual LW discussed three examples of Passages' billing of GIP services and concluded that one patient "clearly does not meet GIP criteria" and that two other patients (including Patient E) "probably were enrolled for an excessive length of GIP duration." One of the examples cited for Patient E was a period from May 6 to May 8, 2010 during which Patient E was placed on GIP for the use of over-the-counter body lotion, which Individual LW had written in the report "clearly does not constitute a change to GIP services." HILSABECK knew that no one did anything to correct the billing for any of these patients. HILSABECK acknowledges that on or about July 21, 2011, Passages Hospice submitted to Palmetto, a Medicare contractor, a false claim, specifically, that services provided to Patient E beginning on May 6, 2010 through May 8, 2010 qualified for reimbursement at the general inpatient level of hospice care.

On or about August 27, 2010, HILSABECK and Gillman received copies of a report prepared by Passages' compliance officer at the time, Individual RJ. In the report, Individual RJ concluded that Passages "appears to be overusing the GIP level of care for patients at 3 times the national average" and recommended that Passages "lower levels of GIP to be more in line with National Averages."

On September 9, 2010, HILSABECK was informed that Individual LW had conducted a training session about GIP with the nurses in the region covering Chicago and its suburbs. HILSABECK reported to Gillman, "The nurses are in an

uproar right now and trying to take everyone off GIP in Region B because of what [Individual LW] did." The next day, HILSABECK reported to Gillman that Individual LW had been told to not provide any more training without getting approvals beforehand. HILSABECK knew that these measures would delay Passages nurses from knowing that Passages had billed and continued to bill GIP improperly and would allow Passages to continue billing more GIP as a result.

In addition, in October 2010, in response to continuing concerns from lower-level employees about whether Passages was billing GIP care properly, Passages arranged for an outside consultant to provide training to the nursing directors and the CNA directors about GIP care. Before the training, HILSABECK and Gillman were copied on an email that Velez, who was at that time the director of clinical services, sent to the nursing directors and the CNA directors and telling them to not say in the training session "how we are doing things or how we have done things."

HILSABECK knew that Passages did not change its GIP practices after the outside consultant's training.

As a result of the scheme, HILSABECK and others caused the loss of millions of dollars to Medicare and Medicaid. HILSABECK acknowledges that the loss reasonable foreseeable to her was approximately $9.5 million.

8. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

9.      Defendant understands that the charge to which she is pleading guilty carries the following statutory penalties:

a.      A maximum sentence of five years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than three years.

b.      Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.      In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which she has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

10.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.     For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.      **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following

13

statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

   b.   **Offense Level Calculations**.

        i.      Pursuant to Application Note 8 to Guideline § 3C1.1, defendant's conviction for conspiring to obstruct a federal audit is grouped with the healthcare fraud offense to which she has stipulated.

        ii.     Pursuant to Guideline § 2B1.1(a)(2), the base offense level for the stipulated health care fraud is 6.

        iii.    Pursuant to Guideline § 2B1.1(b)(1)(K), the offense level is increased by 20 levels, as the parties agree that the loss to Medicare for which defendant was accountable and which was reasonably foreseeable to her was at least $9.5 million but less than $25 million.

        iv.     Pursuant to Guideline § 2B1.1(b)(7), the offense level is increased by an additional 3 levels, as the loss to Medicare for which defendant was accountable and which was reasonably foreseeable to her was more than $7 million.

        v.      Pursuant to Guideline § 3B1.1(b), the offense level is increased by 3 levels, as the defendant was a manager or supervisor in a criminal activity that involved five or more participants and was otherwise extensive.

        vi.     Pursuant to Guideline § 3C1.1 and Application Note 8 to § 3C1.1, the offense level is increased by 2 levels because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administrative of

14

justice with respect to the investigation of the offense of conviction by causing the alteration of patient files requested by TrustSolutions, and because such conduct related to the offense of conviction.

vii.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for her criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for her actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to her ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

viii.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of her intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.    **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

15

d. **Anticipated Advisory Sentencing Guidelines Range**.

Therefore, based on the facts now known to the government, the anticipated offense level is 31, which, when combined with the anticipated criminal history category of I, and pursuant to Guideline § 5G1.1(a), results in an anticipated advisory sentencing guidelines range of 60 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e. Defendant and her attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw her plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a

16

statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw her plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

**Cooperation**

12.    Defendant agrees she will fully and truthfully cooperate in any matter in which she is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding. Defendant agrees to the postponement of her sentencing until after the conclusion of her cooperation.

**Agreements Relating to Sentencing**

13.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 60 months.  Defendant shall be free to recommend any sentence.

14.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the

17

Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw her guilty plea.

15.     Regarding restitution, defendant agrees to pay restitution, arising from the offense of conviction and the stipulated offense conduct set forth above, totaling $9,500,000, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664.

16.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), she is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect her ability to pay restitution.

17.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

18.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

19.     If defendant continues to fully and truthfully cooperate with the government, the government will move to dismiss the remaining counts of the indictment and the forfeiture allegation as to defendant after sentence has been imposed on the count to which defendant pleads guilty as agreed herein.   For

purposes of Title 18, United States Code, Section 3161(h)(7)(A), defendant agrees to the exclusion of time regarding Counts One through Seventeen between the date of the entry of this plea agreement and the date of defendant's sentencing on Count Eighteen.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

20.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 33-2.

21.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

22.     Defendant understands that by pleading guilty she surrenders certain rights, including the following:

a.  **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against her, and if she does, she would have the right to a public and speedy trial.

i.  The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.  If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and her attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.  If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict her unless, after hearing all the evidence, it was persuaded of her guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering

20

each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

      v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and her attorney would be able to cross-examine them.

      vi.     At a trial, defendant could present witnesses and other evidence in her own behalf. If the witnesses for defendant would not appear voluntarily, she could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.    At a trial, defendant would have a privilege against self-incrimination so that she could decline to testify, and no inference of guilt could be drawn from her refusal to testify. If defendant desired to do so, she could testify in her own behalf.

      viii.   With respect to forfeiture, defendant understands that if the case were tried before a jury, she would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

     23.   **Waiver of appellate and collateral rights**. Defendant further understands she is waiving all appellate issues that might have been available if she had exercised her right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a

defendant the right to appeal her conviction and the sentence imposed. Acknowledging this, and based on the concessions made by the government, including agreeing to dismiss the additional charges in the indictment should defendant continue to provide full and truthful cooperation, defendant knowingly waives the right to appeal her conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Agreement. In addition, defendant also waives her right to challenge her conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

24. Defendant understands that by pleading guilty she is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to her, and the consequences of her waiver of those rights.

22

## Presentence Investigation Report/Post-Sentence Supervision

25.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against her, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

26.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of her financial circumstances, including her recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of her sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

27.     For the purpose of monitoring defendant's compliance with her obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's

23

Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

28.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office. Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in

24

connection with a civil or administrative proceeding involving, or investigation of, defendant. Nothing in this paragraph or the preceding paragraph precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

30.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## Conclusion

31.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

32.     Defendant understands that her compliance with each part of this Agreement extends throughout the period of her sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event she violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement

25

may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

33.     Defendant and her attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

34.     Defendant acknowledges that she has read this Agreement and carefully reviewed each provision with her attorney. Defendant further acknowledges that she understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _2-10-16_

_____
ZACHARY T. FARDON
United States Attorney

_____
STEPHEN CHAHN LEE
Assistant U.S. Attorney

_____
GWEN HILSABECK
Defendant

_____
JOHN COLLINS
Attorney for Defendant

26